IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CARL LEEPER, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 16-CV-250-NJR-DGW |
| ALLIANCE RESOURCE PARTNERS, L.P., and HAMILTON COUNTY COAL, LLC, ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court is a Motion for Summary Judgment filed by Defendants (Doc. 71), a Motion to Oppose Plaintiff's Proposed Class Certification or to Stay Class Certification Pending Resolution of Defendants' Motion for Summary Judgment filed by Defendants (Doc. 72), a Motion to Certify Class filed by Plaintiff Carl Leeper ("Leeper") (Doc. 82), a second Motion for Summary Judgment filed by Defendants (Doc. 136), a Motion for Summary Judgment filed by Leeper (Doc. 138), and a Motion to Amend/Correct Motion to Certify Class filed by Leeper (Doc. 157).

### FACTUAL & PROCEDURAL BACKGROUND

Leeper brings this putative class action against Defendants Alliance Resource Partners, L.P. ("Alliance") and Hamilton County Coal, LLC ("Hamilton"), alleging violations of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq*. Specifically, Leeper alleges that Defendants violated his rights and

a class of similarly situated persons' rights under the WARN Act by failing to provide timely notice to workers who suffered an employment loss.

Leeper was a full-time employee of Hamilton (Doc. 136-3, p. 27).[1] Hamilton is a subsidiary of Alliance (Doc. 153, p. 24; Doc. 153-2, p. 5-6). Leeper specifically worked at the Hamilton County Coal Mine #1, which is an underground mining complex located near the city of Dahlgren in Hamilton County, Illinois (Doc. 37, p. 3; Doc. 136-3, p. 2).

During a meeting held on February 5, 2016, Hamilton delivered written notice to 158 full-time employees stating that "due to operational considerations," the employees would be placed on a "temporary layoff for the period commencing on February 6, 2016 and ending on August 1, 2016 ("Layoff Period")." (Doc. 71-2, p. 7). Hamilton explained that "[o]n August 1, 2016, [the employees] may return to [their] at-will employment with Hamilton County Coal." (*Id.*). The written notice further advised that "[d]uring the Layoff Period, and beginning effective February 6, 2016, [the employees] will not be employed by Hamilton County Coal" and "are free to pursue other endeavors . . . [the employees] will receive additional information related to any separation benefits to which [they] may be entitled." (*Id.*).

Along with this notice, employees received a document entitled "Frequently Asked Questions Concerning the Temporary Layoffs" ("FAQs") (Doc. 71-2, p. 9). This document stated that "[a] temporary layoff is treated as a termination of employment for purposes of wages and benefits." (*Id.*). It explained, among other things, that the employees' health care coverage would end, an advance would be withheld from their

---

[1] The parties dispute whether Leeper was also an employee of Alliance for purposes of the WARN Act (Doc. 138, p. 23-26; Doc. 153, p. 23-26).

final paycheck (if they elected to receive a pay advance), disability benefits would end, life insurance would end, and accrued and unused vacation days would be paid out in a lump sum (Doc. 71-2).

The employees were also given a pamphlet setting forth their rights regarding unemployment benefits (Doc. 153-1, p. 14-17) and a contact form to fill out so Hamilton could reach the employees for return to work purposes (Doc. 71-2, p. 19; Doc. 71-2, p. 3; Doc. 71-4, p. 3).

Less than six months later, by August 1, 2016, 61 full-time employees had returned to work at Hamilton.[2] Of those employees, 56 employees returned to their prior wages, and 5 employees returned to work at reduced wages.[3] These employees were not required to submit applications for employment, nor where they required to interview for their positions (Doc. 71-2, p. 3).[4] Sixteen full-time employees voluntarily declined the opportunity to return to work, and one employee was discharged for cause because he tested positive during a drug screen. Out of all 158 full-time employees that received the notice, 80 employees did not receive offers to return to work within six months.

---

[2] Some employees started returning to work as early as February 10, 2016 (Doc. 75, p. 93).
[3] The numbers have changed over the course of the briefing, which has caused the Court some confusion. At the hearing on August 13, 2018, the undersigned explicitly confirmed with the attorneys on both sides that the above-mentioned statements regarding the total amount of full-time employees, the amount of full-time employees who received the written notice, the amount of full-time employees that returned to work (at full wages and reduced wages), the amount of full-time employees that voluntarily declined the opportunity to return to work, and the amount of full-time employees that were discharged for cause are accurate.
[4] Specifically, these workers were called by Hamilton representatives regarding the opportunity to return to work (Doc. 121-6, p. 6). If the employee said "yes," then he was told to report to work on a certain date and that he would be required to undergo the necessary retraining and to submit to return-to-work screening (Doc. 121-7, p. 2). Employees also were required to fill out paperwork with human resources, such as an employee authorization form, which indicated that they were a "rehire," the hourly wage offered, and the start date (Doc. 124).

On March 8, 2016, Leeper filed this lawsuit on behalf of himself and a class of similarly situated individuals alleging that Defendants failed to provide a "60-day advanced notice of a 'mass layoff' of nearly 200 employees that occurred at its Hamilton County Coal Mine #1 on February 5, 2016" in violation of the WARN Act (Doc. 1). Leeper alleges that Defendants instead provided less than twenty-four hours' notice that they were terminating their employment and that all benefits would cease as of the date of termination (*Id.*). On January 4, 2017, Leeper filed an Amended Complaint, alleging an alternative theory that Defendants' actions on February 6, 2016 constituted a mass layoff because the employees experienced a reduction in hours of work of more than 50% during each month between February 6, 2016 and August 6, 2016 (Doc. 37).

Leeper's First Amended Class Action Complaint brings claims pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(3), and 23(c)(4), and the WARN ACT, 29 U.S.C. § 2104(a)(5). On March 21, 2018, Defendants filed a Motion for Summary Judgment (Doc. 71) and a preemptive Motion to Oppose Plaintiff's Proposed Class Certification or to Stay Class Certification Pending Resolution of Defendants' Motion for Summary Judgment (Doc. 72). On March 27, 2018, Leeper filed a Motion to Certify Class (Doc. 82) seeking to certify the following classes and subclasses:

**Class 1**:

All persons: (a) to whom Hamilton delivered the form letter attached hereto as Exhibit 14; or (b) whose employment at the Complex was terminated without cause within 90 days of February 6, 2016, without 60-days' advance written notice.

**Subclass 1**:

All persons: (a) in Class 1(a) who: (i) did not work at the Complex between February 6, 2016 and August 6, 2016; or (ii) were rehired at the Complex

between February 6, 2016, and August 6, 2016, at a salary or regular hourly wage less than the person's salary or regular hourly wage at the Complex as of February 5, 2016; or (iii) were rehired at the Complex between February 6, 2016, and August 6, 2016, but worked fewer hours per week than the person's hours per week worked at the Complex as of February 5, 2016; or (b) in Class 1(b).

**Class 2**:

All persons who: (a) are in Subclass 1; or (b) experienced a reduction in hours of work at the Hamilton County Coal Mine #1 Complex of more than 50 percent during each month of the 6-month period between February 6 and August 6, 2016.

(Doc. 82, p. 33-34).

On June 22, 2018, Defendants filed another Motion for Summary Judgment (Doc. 136). On that same date, Leeper also filed a Motion for Summary Judgment (Doc. 138). On August 7, 2018, Leeper filed a Motion to Amend Proposed Class Definitions (Doc. 157), seeking to amend the class definitions as follows:

**Class 1 (the "Termination Class")**:

The 182 persons identified on the list attached hereto as Exhibit __, to whom Defendant Hamilton delivered the RIF Notice on February 5, 2016.

**Class 2 (the "Reduction in Hours and Termination Class")**:

The 165 persons identified on the list attached hereto as Exhibit __, to whom Defendant Hamilton delivered the RIF Notice on February 5, 2016, and:

(A) who were not on leave for disability or workers' compensation as of February 5, 2016 and were offered reemployment starting August 1, 2016;

or

(B) to whom Defendant issued form letters dated July 26, 2016 stating that they were not going to be rehired beginning August 1, 2016, or whom Defendants rehired between February 5 and July 31, 2016, at a lower wage than as of February 5, 2016.

(Doc. 157).

Leeper asserts that Defendants' actions with respect to Leeper and the Class 1 Members constituted a "mass layoff" because 182 full-time employees experienced an employment loss by way of a termination under 29 U.S.C. § 2101(a)(6)(A). Leeper alternatively argues that Defendants' actions constituted a "mass layoff" with respect to Leeper and the Class 2 Members because 165 employees experienced a termination or reduction in hours of work of more than 50 percent during each month of the six-month period between February 6 and August 6, 2016.

On August 13, 2018, the Court held a hearing on the motions (Doc. 160) and took the motions under advisement.

**PRELIMINARY MATTER**

The Court must first address the order in which to resolve the various motions. Generally, the Federal Rules of Civil Procedure require courts to rule on the issue of class certification "at an early practicable time," which is usually before deciding any merits questions. FED. R. CIV. P. 23(c). The Seventh Circuit has acknowledged, however, that there are situations where it might be appropriate to rule on summary judgment prior to addressing class certification. *Cowen v. Bank United*, 70 F.3d 937, 941 (7th Cir. 1995) (Rule 23(c) "requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment. But 'usually' is not 'always,' and 'practicable' allows for wiggle room.").

At the hearing, defense counsel asked the Court to take up the motions for summary judgment prior to the motion for class certification. "In moving for summary judgment before the motion for class certification has been resolved, the defendant loses

the advantage of a judgment that has preclusive effect against all putative suitors but saves the heavy expense of defending against a class action." *McCarter v. Ret. Plan for Dist. Managers of Am. Family Ins. Grp.*, No. 3:07-CV-00206-BBC, 2007 WL 4333979, at *5 (W.D. Wis. Nov. 16, 2007), *aff'd as modified*, 540 F.3d 649 (7th Cir. 2008).

One instance in which it may be appropriate for a Court to rule on summary judgment prior to class certification is "when there is sufficient doubt regarding the likelihood of success on the merits of a plaintiff's claims." *Hakim v. Accenture U.S. Pension Plan*, 735 F. Supp. 2d 939, 956 (N.D. Ill. 2010). Another instance is when "'as soon as practicable' occurs after a case is already 'ripe for summary judgment'" *Chavez v. Illinois State Police,* 251 F.3d 612, 629, 630 (7th Cir. 2001).

In light of the likelihood of success on the merits of Leeper's claims and the current posture of this case, the Court finds it to be in the interest of judicial economy to decide the motions for summary judgment prior to addressing class certification.

### LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (*quoting* FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a

genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." *Reid v. Neighborhood Assistance Corp. of America*, 749 F.3d 581, 586 (7th Cir. 2014) (*quoting Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017).

## ANALYSIS

The Court begins its analysis by noting that it has federal question jurisdiction over this case pursuant to 29 U.S.C. § 2104(a)(5) and 28 U.S.C. § 1331.

The WARN Act requires employers to provide employees with written notice of impending "plant closings" or "mass layoffs" at least sixty days prior to the closing or layoffs. 29 U.S.C. § 2102. Congress passed the WARN Act with the purpose of providing "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining . . . ." 20 C.F.R. § 639.1(a); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 586 (7th Cir. 2005) ("[I]ts purpose is to soften the economic blow suffered by workers who unexpectedly face plant closings or mass layoffs.").

The notice requirements of the WARN Act are triggered if there is a "mass layoff." 29 U.S.C. § 2102(a). Courts apply the WARN Act only to "mass layoffs" that meet certain employment thresholds. 20 C.F.R. § 639.2. The WARN Act defines a "mass layoff" as a reduction of force which results in employment loss for "at least 33 percent of the employees" and "at least 50 employees." 29 U.S.C. § 2101(a)(3).[5] An "employment loss" is defined as: (a) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (b) a layoff exceeding 6 months, or (c) a reduction in hours of

---

[5] Specifically, 29 U.S.C. § 2101(a)(3) provides as follows:
    (3) the term "mass layoff" means a reduction in force which –
        (A) is not the result of a plant closing; and
        (B) results in an employment loss at the single site of employment during any 30-day period for –
            (i)(I) at least 33 percent of the employees (excluding any part-time employees); and
            (II) at least 50 employees (excluding any part-time employees); or
            (ii) at least 500 employees (excluding any part-time employees).

work of more than 50 percent during each month of any 6-month period. 29 U.S.C. § 2101(a)(6).

Leeper argues that Defendants failed to provide the necessary 60 days' notice to himself and the proposed class when at least 33 percent and more than 50 of Hamilton's employees experienced an employment loss on February 6, 2016. Specifically, Leeper argues that the employment loss he and the proposed class suffered was a *termination* as set forth in 29 U.S.C. § 2101(a)(6)(A). Leeper alternatively argues[6] that the employment loss was a "reduction in hours of work of more than 50 percent in each month of any 6-month period," as set forth in 29 U.S.C. § 2101(a)(6).

Under Leeper's first theory, he argues that 158 full-time employees were terminated out of a total of 315 full-time employees, which constitutes more than 33 percent of the Hamilton workforce. Defendants respond that the employment loss was actually a *layoff*. They argue that, since the layoff did not exceed six months as required under 29 U.S.C. § 2101(a)(6)(B), there was no employment loss under the WARN Act.

Thus, the Court must first address whether the employees suffered a termination or a layoff. If the Court finds that the undisputed facts show that the employment loss was a termination, then the termination was effective as of February 6, 2016, it affected all 158 full-time employees, and the subsequently rehired employees do not change that conclusion. If the Court finds that the undisputed facts show that the employment loss suffered was a layoff then, as Defendants argue, the layoff did not exceed six months,

---

[6] While Leeper previously referred to this argument as his alternative argument in his Motion for Partial Summary Judgment, he now refers to the termination argument as the "alternative argument" (Doc. 138, p. 21). Regardless, the Court will address the arguments in the above sequence.

because 61 full-time employees returned to work within the six-month period (56 were fully restored to pre-layoff wages and 5 returned to work at reduced wages). Under this line of reasoning, there would have been no "employment loss" under 29 U.S.C. § 2101(a)(6)(B) because the layoff did not exceed six months as to 33 percent of full-time employees.

The guidelines from the Department of Labor explain that, for purposes of defining "employment loss," "termination" means the "permanent cessation of the employment relationship" and "layoff" means the "temporary cessation of that relationship."[7] Worker Adjustment and Retraining Notification, 54 FR 16042-01 (1989). Further, "it is actuality and not expectations or terminology which control whether an employment loss has occurred." *See Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (8th Cir. 1996).

The parties make much to-do about the terminology used in the written notice and supporting documentation given to the employees. The notice calls it a "temporary layoff," but the FAQs explain that a "temporary layoff" is treated as a "termination of employment for purposes of wages and benefits." Regardless of the terminology used by the employer, it is the actuality of the event that controls. Thus, the Court must look to

---

[7] A district court in the Northern District of Illinois similarly looked to this Department of Labor regulation in order to interpret the term "employment termination." *See Acevedo v. Heinemann's Bakeries, Inc.*, 619 F. Supp. 2d 529, 534 (N.D. Ill. 2008) ("Although the WARN Act itself does not define 'employment termination,' a Department of Labor regulation states . . . 'employment termination' means the 'permanent cessation of the employment relationship.'"). The Fourth, Sixth, and Eighth Circuits also have looked to Department of Labor comments for guidance. *See Graphic Communications Intern. Union, Local 31-N v. Quebecor Printing (USA) Corp.,* 252 F.3d 296, 299 (4th Cir. 2001) (quoting the Department of Labor Comments defining a termination as a "permanent cessation of the employment relationship."); *see also Morton v. Vanderbilt University*, 809 F.3d 294, 295-96 (6th Cir. 2016) ("The term 'termination is not defined in the WARN Act, but the Department of Labor has explained that it is 'to have [its] common sense meaning' as 'the permanent cessation of the employment relationship.'"); *see also Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (1996) (quoting the Department of Labor comments).

whether it was a termination involving the "permanent cessation of the employment relationship" or a temporary layoff involving the "temporary cessation of that relationship." Of the 158 employees that received the written notice, 56 were fully restored to pre-layoff wages within six months.[8] Thus, there was no permanent cessation of the employment relationship as to these 56 employees. *See Rifkin*, 78 F.3d 1277 (1996) ("An employee cannot be defined as 'terminated' if he or she is, in fact, rehired in the same position.").

Because 56 of the 158 full-time employees who received the written notice returned to work within six months, Leeper cannot establish that more than 33 percent of the 315 full-time employees experienced an employment termination. Instead, these workers suffered a layoff (or a "temporary cessation" of the employment relationship) because they returned to work at pre-layoff wages. While the Court is certainly empathetic to the employees' situation, the Warn Act "draws a lot of bright lines" and "[b]right lines must be enforced consistently or they won't work." *Phason v. Meridian Rail Corp.*, 479 F.3d 527, 530 (7th Cir. 2007); *see also Ellis v. DHL Exp. Inc. (USA)*, 633 F.3d 522, 526 (7th Cir. 2011) ("Despite the lack of practical distinction between eliminating 49 or 50 full-time jobs, or between laying off 32% or 33% of a workforce in a thirty-day period, the numerical thresholds in the WARN Act are immutable.").

Leeper alternatively argues that Defendants' actions constituted a "reduction in hours of work of more than 50 percent in each month of any 6-month period," as set forth

---

[8] These employees received years-of-service credit for purposes of their 401(k) benefits as if they had no break in service during the temporary layoff period and did not lose vesting by virtue of having been placed on a temporary layoff (Doc. 136-6, p. 3; Doc. 153-11, p. 3).

in 29 U.S.C. § 2101(a)(6). Specifically, Leeper argues that at least 141 (44%) of Hamilton Coal's 315 full-time workers suffered a reduction in hours of work of more than fifty percent during the six-month period of February 6, 2016 through August 6, 2016. The Court has already found that the employment loss suffered by the employees was a layoff (that did not exceed 6 months for more than 33% of the full-time workforce). The issue then becomes whether a layoff can simultaneously be considered a "reduction in hours of work of more than 50 percent in each month of any 6-month period."

The relevant section of the WARN Act reads as follows: "the term 'employment loss' means (A) an employment termination, other than a discharge for cause, voluntary departure, retirement, (B) a layoff exceeding 6 months, *or* (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. § 2101(a)(6) (emphasis added).

Leeper argues that, under the plain language of the statute, an employment loss occurs when *any* one of the subsections apply, and the WARN Act clearly contemplates that an employee may suffer *multiple* employment losses, necessitating separate notices. Defendants respond by pointing out that the plain language of the statute distinguishes between the terms "layoff" and "reduction in hours" and argue that adopting Leeper's interpretation would render section subsection (B) meaningless.

Under the rules of statutory interpretation, courts "must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose." *U.S. v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004) (citing *Grzan v. Charter Hosp. of Northwest Ind.*, 104 F.3d

116, 122 (7th Cir. 1997)). "In determining whether the meaning of statutory language is plain or ambiguous, we look to the specific language at issue, the context in which the language is used, and the broader context of the statute as a whole." *Id*. (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Courts should not "construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous." *Id*. (citing *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1272 (7th Cir. 1993)).

The WARN Act's definition of "employment loss" separately and alternately delineates "termination," "layoff," and "reduction in hours," thereby indicating that such terms encompass distinct actions by the employer.[9] Of course, an employee who experiences a layoff that exceeds six months also experiences a one-hundred percent reduction of work during each month of that six-month period. But if a subsection (C) "reduction in hours" also covers the situation in which an employer implements a layoff, there would be no purpose for subsection (B) because every layoff exceeding six months would already be addressed by subsection (C). This would render subsection (B) meaningless, redundant, and superfluous.[10]

---

[9] As Defendants aptly point out, there are logical and practical reasons for distinguishing a "layoff" from a "reduction in hours." For example, where as in this case the employer implements a temporary layoff, the employee is free to obtain other employment during the layoff period. This differs from a situation in which employers could string workers along by continuing to regularly occupy their time while significantly reducing their work hours on an indefinite basis.

[10] Subsection (C) also would encompass a layoff exceeding 5 ½ months, but falling short of 6 months, which many of the employees experienced in this case. That is because the moment the layoff exceeds 5 ½ months, the employee would have experienced a reduction in work hours of more than fifty percent in each month of a six-month period. Thus, if the Court construes the statute as Leeper suggests, employers would be told under subsection (B) that they need to give advanced notice under the WARN Act of a layoff expected to exceed six months, and they would have to read between the lines to learn under subsection (C) that they *also* need to give advanced notice under the WARN Act for a layoff expected to exceed 5 ½ months. The Court does not believe that Congress intended the WARN Act to operate in such a manner.

Leeper has not cited to any controlling authority indicating that the Court should read the statute in the way that he suggests. Leeper cites to *Phason v. Meridian Rail Corp.*, 479 F.3d 527, 527 (7th Cir. 2007), but this case does not hold that a temporary layoff may be simultaneously treated as a reduction in hours under subsection (C).

*Phason* involved a plant closing, which 29 U.S.C. § 2101(a)(2) defines as "any permanent or temporary" shutdown that "results in an employment loss at the single site of employment during any 30-day period for 50 or more employees." Workers who lost their jobs with their employer, Meridian Rail Corporation ("Meridian"), were invited to apply for jobs with NAE Nortrak, Inc. ("Nortrak"), the company that agreed to buy Meridian's assets. *Id*. at 528. Although the agreement was in place when the employees were let go by Meridian, the transaction did not close until one week after Meridian had severed all ties to the former workers. *Id*. The district court granted summary judgment for Meridian on the basis that the WARN Act did not apply because Nortrak eventually hired many of the workers back, and thus 50 or more employees did not suffer an employment loss. *Id*. at 529. On appeal, the plaintiffs argued that all employees that Meridian let go suffered a termination on December 31, 2003, regardless of whether they were hired by Nortrak one week later. *Id*.

The Seventh Circuit Court of Appeals agreed with the plaintiffs, holding that Meridian terminated the employees within the meaning of subsection (A) when it closed its operations and "severed all ties" to the workers on December 31, 2003. *Id*. The Court of Appeals reasoned that, even though Nortrak hired many of these employees, the sale

did not close until January 8, 2004, so Section 2101(b)(1)[11] could not be used to avoid the classification of the event as an "employment loss." *Id.* at 529-530.

The Court of Appeals briefly addressed Meridian's argument that subsection (C) did not apply. *Id.* at 529. Specifically, the Court of Appeals dismissed this argument as irrelevant, stating "[b]ut what of that? An 'employment loss' occurs when *any one* of the subsections applies." *Id.* (emphasis in original). Because the Court of Appeals had already found the employment loss to be a termination under subsection (A), it did not matter whether subsection (C) was not satisfied. *Id.* This case does not shed any light on whether employees who experienced a temporary layoff but returned to work prior to six months may nevertheless prove a "reduction in hours" employment loss under subsection (C).

Leeper also cites to *Graphic Communs. Int'l Union, Local 31-N v. Quebecor Printing Corp.*, 252 F.3d 296, 299 (4th Cir. 2011), to argue that an employee can suffer an employment loss for "any or all" of a termination, layoff, or reduction in hours. In *Quebecor*, the Court of Appeals for the Fourth Circuit explained that employees may experience separate and successive employment losses necessitating separate notices, for example, where an employee who experienced a reduction in hours is subsequently laid off or terminated. *Id.* This case does not hold, however, that a single event can constitute an employment loss under two different provisions of the statute.

The only case that appears to have considered this issue so far (perhaps because it is a relatively novel theory) is *United Steel v. Ainsworth Engineered (USA), LLC*, Civil No.

---

[11] Section 2101(b)(1) provides: Notwithstanding any other provision of this Act, any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of the purchaser immediately after the effective date of the sale.

07-4731 ADM/RLE, 2008 WL 4857905, at *5 (D. Minn. Nov. 10, 2008). There, the Court decided that a temporary layoff could not be simultaneously treated as a reduction in hours under subsection (C). *Id*. The Court reasoned that "if the Court were to read § 2101(a)(6) so as to permit the application of [subsection] (C) to an event expressly contemplated by [subsection] (B), there simply would be no need for [subsection] (B) since every layoff that exceeds six months also results in a reduction in work hours of more than fifty percent in each month of a six-month period." *Id*. at *5. The Court determined that, because the employment loss suffered was a layoff, subsection (C) was inapplicable. *Id*. at *6. The Court agrees with this conclusion. Unless or until the Seventh Circuit Court of Appeals says otherwise, the Court will not construe the Warn Act in a way that makes subsection (B) meaningless, redundant, and superfluous.

Overall, the Court concludes that the employees did not suffer an employment loss as that term is defined in § 2101(a)(6). Thus, any failure by Hamilton to provide 60 days' advanced notice before instituting the layoff did not constitute a violation of the WARN Act. In light of this finding, the Court need not address the argument that Alliance was not an employer under the WARN Act.

## Conclusion

For the reasons explained above, the Court **GRANTS**[12] the Motion for Summary Judgment filed by Defendants (Doc. 71), **GRANTS** the Motion for Summary Judgment filed by Defendants (Doc. 136), **DENIES** the Motion for Partial Summary Judgment filed by Leeper (Doc. 138), **DENIES as moot** the Motion to Oppose Plaintiff's Proposed Class

---

[12] The Court grants this motion only to the extent it relies upon the revised and corrected numbers as argued by counsel and agreed to by both sides at the hearing on August 13, 2018.

Certification or to Stay Class Certification Pending Resolution of Defendants' Motion for Summary Judgment filed by Defendants (Doc. 72), **DENIES as moot** the Motion to Certify Class filed by Leeper (Doc. 82), and **DENIES as moot** the Motion to Amend/Correct Motion to Certify Class filed by Leeper (Doc. 157). The Court also unrefers and **DENIES as moot** the Motion for Extension of Discovery Deadline for Purposes of Hulett Guill's Deposition and Related Discovery (Doc. 129). The case is **CLOSED**, and judgment will be entered accordingly.

    IT IS SO ORDERED.

    DATED: December 17, 2018

**s/ Nancy J. Rosenstengel**_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**
